# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### OCTOBER 13, 2010 Session

## IN RE: CHRISTOPHER M.

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
## v. EBONY M.

Direct Appeal from the Chancery Court for Shelby County
No. CH-09-1277-3      Kenny Armstrong, Chancellor

No. W2010-01410-COA-R3-PT - Filed November 1, 2010

Mother appeals from the termination of her parental rights on the grounds of abandonment, substantial noncompliance with permanency plans, and mental incompetence. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Shantell S. Suttle, Cordova, Tennessee, for the appellant, Ebony M.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Elizabeth C. Driver, Senior Counsel, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services

# OPINION

## I.  FACTS & PROCEDURAL HISTORY

Christopher M. was born on April 18, 2005.  His mother, Ebony M. ("Mother"), was thirteen years old at the time.  Mother was in the custody of the Tennessee Department of Children's Services ("DCS") and living in foster care.  Mother had become pregnant while on runaway status.  She claimed that Christopher's father was a gang member and that she did not know his last name.  Because of her lack of resources, Mother voluntarily placed Christopher in DCS custody when he was two days old so that he could receive services, medical care, and supervision and live in a foster home with her.

An initial permanency plan was developed on May 5, 2005, with the stated goal of reunifying Christopher with Mother.  The plan listed as a desired outcome that Christopher would exit DCS custody with Mother when she reached the age of eighteen.  The plan required Mother to follow all DCS rules and regulations and refrain from engaging in unruly or delinquent behavior that could result in Christopher remaining in custody.  The juvenile court subsequently entered a protective custody order, which stated that Mother was unable to care for the child on her own and that she had placed him in DCS custody under a voluntary placement agreement.  The court later entered an order finding that Christopher was in need of the protection of the court and that it was in his best interest to enter DCS custody to live in a foster home with Mother.

Thereafter, Mother's foster parent contacted a Mobile Crisis Unit because Mother had stated that she was hearing voices telling her to harm herself and Christopher.  On or about March 31, 2006, Mother was admitted to a facility called "Lakeside" for a short time, where she received a comprehensive psychosocial assessment.  Mother was apparently placed in another foster home, but she ran away in June 2006 for three days. On July 7, she underwent a psychiatric evaluation with a Dr. Patel, although it is unclear at what facility this took place. In September of 2006, Mother ran away again for three days.  Due to Mother's auditory hallucinations, Christopher was removed from the foster home while Mother was gone.  He was placed in a new foster home with Vickie J.

Mother ran away again on February 22, 2007.  She returned for one day in April, then ran away again until May 3, 2007.  When asked why she had run away, Mother stated that she wanted to stay with her boyfriend.  Mother was placed at a residential treatment facility called Youth Dimensions on May 3, but her behavior continued to escalate, and on May 15, she was moved to another residential treatment facility called Windsor Home. There, Mother received another psychiatric evaluation and was prescribed medications.  Mother remained at Windsor Home for a couple of months "until she was able to reach a level to be considered

stepping down into a foster home."

On July 27, 2007, shortly after her sixteenth birthday, Mother was moved from Windsor Home to a foster home. However, she continued to be disruptive and was removed from the foster home after approximately six weeks. Mother was placed in another foster home on September 7, but she was removed again after three weeks due to her behavior. Mother was then "increased to a Level III Residential" status and placed in a residential home called Madison Oaks Academy in Jackson, Tennessee.

Mother remained at Madison Oaks Academy from September 28, 2007, until May 21, 2008. She received a mental health assessment and medication management while there, and Christopher was regularly transported from Memphis to Jackson to visit Mother. While Mother was residing at Madison Oaks, the court approved a permanency plan stating a goal of "return to parent" upon finding that Mother was working toward the goal and visiting with Christopher on a regular basis.

When Mother was released from Madison Oaks on May 21, 2008, she was placed in another foster home. Mother was removed from this home after six weeks when DCS received a "serious incident report" stating that Mother had waved a knife at the foster parent's children because she was upset about a boy and then assaulted the foster parent the next day. On July 8, shortly after Mother turned seventeen, she was placed in one of her previous foster homes, where she remained for three months before she was removed for being disruptive. On October 15, Mother was placed in yet another foster home. On October 29, 2008, she completed a mental health assessment at Southeast Mental Health Center. She was also offered counseling and medication management at the facility, and she apparently attended one follow-up appointment.

A revised permanency plan was developed for Christopher on November 3, 2008. This plan listed a "Goal A" of adoption and a "Goal B" of return to parent. The plan stated that DCS would be able to make a proper recommendation regarding whether reunification was in Christopher's best interest once Mother completed a mental health assessment at the LeBonheur Center for Children and Parents ("CCP") and DCS received the recommendations from the assessment.[1] The plan stated that if the CCP determined that Mother could not

---

[1] The CCP accepts cases of alleged child abuse or neglect and, through the work of social workers, psychologists, and other health professionals, performs a multi-disciplinary evaluation of the family situation. It uses this evaluation to make a recommendation to DCS regarding treatment needs and the appropriate method of intervention. *See **State, Dep't of Children's Servs. v. Mims***, 285 S.W.3d 435, 438 n.4 (Tenn. Ct. App. 2008).

(continued...)

properly care for Christopher, DCS would begin the process of termination of parental rights in order to ensure permanency was found for Christopher. Regarding the goal of return to parent, the plan continued to list as a desired outcome that Christopher would exit custody with Mother upon emancipation. In order to achieve that goal, Mother was required to identify a stable home for herself and Christopher prior to emancipation, attend all medical appointments, continue medication management through Southeast Mental Health Center and take all medications prescribed for her diagnoses of Bipolar Disorder, Oppositional Defiant Disorder, Posttraumatic Stress Disorder, and Cannabis abuse. Mother was also required to refrain from any unruly or delinquent behaviors that would result in Christopher remaining in custody. Finally, the plan provided that Mother would attend at least four hours of supervised visitation per month. The plan stated that there were no restrictions on her ability to make telephone calls or send letters to Christopher's foster home.

A few weeks after the revised permanency plan was developed, DCS held a specially-called "Age Seventeen-and-a-Half" Child and Family Team Meeting, in which Mother participated. The meeting was held to discuss the plans and goals that Mother needed to achieve within the next six months, prior to her eighteenth birthday on July 5, 2009. Mother was provided with information regarding obtaining independent living skills. One of the concerns discussed with Mother was that she would need to remain in her current foster placement for six months. Mother was also informed that she would be eligible for transitional living and post-custody services if she remained in DCS custody, whereby she would be provided with housing and employment assistance. The family services worker went over the permanency plan with Mother and informed her that she needed to have stable housing when she exited DCS custody and continue medication management. DCS's summary of the meeting states that Mother was willing to comply with the recommendations of the permanency plan. It also stated that Mother and Christopher had maintained a regular visitation schedule and that such visitation would continue in the following months. At another Child and Family Team Meeting on December 8, 2008, Mother was referred to the Exchange Club for counseling, parenting classes, and anger management classes, and the family services worker also discussed Mother's plan regarding independent living.

In December 2008, Mother completed the mental health assessment at the LeBonheur CCP. Christopher went to Mother's foster home for overnight visitation during Christmas vacation from approximately December 24, 2008, until January 3, 2009. On January 26, however, Mother ran away again.

Mother was still on runaway status when another permanency plan was developed for

_____

[1](...continued)

Christopher on May 6, 2009. The plan restated the dual goals of adoption and/or return to parent. It listed as conditions that prevent Christopher from leaving state custody: Mother must secure and maintain stable housing, and Mother must complete and comply with the recommendations of the mental health assessment. Mother was also required to visit Christopher for four hours per month, complete parenting classes, continue mental health services, comply with medication management, and refrain from unruly behavior. On May 11, 2009, the Memphis Police Department transported Mother to the DCS office, and while there, Mother signed the May 6 permanency plan and the criteria and procedures for terminating parental rights. However, Mother ran away from the DCS office that same day, before DCS found a placement for her.

On June 16, 2009, DCS filed a petition to terminate the parental rights of Mother and Christopher's unknown father. The petition alleged that grounds for terminating Mother's parental rights existed due to abandonment by failure to visit or support, substantial noncompliance with the permanency plans, and mental incompetence. The petition further alleged that the termination of parental rights was in Christopher's best interest. Attached to the petition was the affidavit of a DCS Case Manager, which stated that Mother's whereabouts were unknown and that DCS had filed a missing persons report and contacted Mother's relatives in an attempt to locate her. An attorney was appointed for Mother, and a guardian ad litem was appointed for Christopher. Mother's eighteenth birthday was on July 5, 2009. The day after her birthday, Mother went to the DCS office to inquire about obtaining her social security card and birth certificate. Mother was later located and served with process.

The hearing on the termination petition was held on February 2, 2010. Mother was eighteen years old at the time, and Christopher was four and a half years old. Mother testified that she was ready to be a good parent to Christopher. However, she had not seen Christopher in over a year. Mother testified that she last saw Christopher on January 3, 2009, when he was picked up from Christmas visitation at her last foster home. Mother testified that she had no job, she had never been employed, and her only income was food stamps. She said that she was living with her fiancé, who was also unemployed, and that he was receiving unemployment income. Mother admitted that she had no place for Christopher to sleep. Mother said that her plan for providing for Christopher was to go to school to become a nurse. When asked why it is important for a parent to visit with her child, she simply replied, "Oh Jesus." When asked again, she said that visiting is important "[s]o a child wouldn't be took away from her mother." Mother admitted that she had not sent Christopher a birthday gift or card or Christmas gift in the past year. She testified that she did not have his telephone number while she was "on runaway," but she acknowledged that she knew where the DCS office was located. Mother testified that she went to the DCS office "on [her] own" the day after she turned eighteen, but she said that she did not ask about

-5-

Christopher. Mother said she went to the DCS office again the following month to obtain Christopher's foster mother's telephone number. When asked how often she talks to Christopher, Mother replied, "Not that often. I do call and check on him."

Mother testified that she had entered DCS custody when she was eleven years old. Mother acknowledged that she was moved around "pretty frequently" while in foster care. She said the reasons for her moves were either that she did not like the foster home or that the foster parent did not want Mother there because of her temper. Mother said that her temper caused her to act out inappropriately and run away. Mother first testified that she had only gotten into one fight one time in a foster home, and that she had never hit anyone. She also denied ever hitting a foster parent. Mother then testified that she had been in more than one fight, with two foster children. Mother claimed that her last foster mother was "abusive" to her on one occasion. Mother said that after she told her foster mother not to put her hand in Mother's face, the foster mother "put her hand against my face and just hit me upside my head." However, she said that this was the only incident involving any of her foster parents where she felt as if she was mistreated, and Mother had not reported the incident to DCS. Mother then testified that she felt unsafe in her last foster home because the foster mother drank a lot and the foster mother's nephew gave Mother "a bad vibe" because he would "touch on" her. Mother acknowledged engaging in fights in her last foster home, with the foster mother's adopted child and with a foster child who lived in another home. She did not ask anyone with DCS to remove her from the foster home.

Mother testified that she had been diagnosed as "Bipolar," but she did not remember the medications she had been prescribed. Mother said that she did not take the medications anymore and that she did not think it was important to take her medications because she did not think she was bipolar. Mother testified that she no longer had a temper problem. She said she had a temper while in DCS custody because she had been taken away from her mother.

Mother testified that she was not aware of the parenting plans that were developed for Christopher. She claimed that when she signed the last parenting plan, when the police department transported her to DCS, no one explained what she was signing. She also claimed that no one explained the criteria for termination of parental rights document that she signed the same day. The DCS case manager for Mother and Christopher, Dakshanique Garry, testified that Mother was notified of the requirements of each of the permanency plans. She pointed out that Mother attended the Age Seventeen-and-a-Half meeting on November 20, 2008, and that the November 3 permanency plan was explained to her on that date. Ms. Garry testified that the May 6, 2009 permanency plan was explained to Mother before she signed it on May 11, when she was transported to the DCS office by the police. Ms. Garry testified that the document explaining the criteria for termination was also

-6-

explained before Mother signed it.

Ms. Garry explained that DCS encountered difficulties in providing services to Mother due to her "running history." She testified that Mother had been placed in over twenty placements since she entered DCS custody, and that Mother had run away about six times since Christopher was born. Ms. Garry testified that there were "several serious incident reports" filed regarding Mother's behavior and her unruliness directed at her foster parents. She said that Mother had "an extensive history of violent and aggressive behavior" and that all reports indicated that Mother initiated the aggressive behavior. She mentioned that Mother had shoved and become physically aggressive with a foster parent, assaulted another foster parent, and swung a knife at foster children after becoming upset about a boy. Ms. Garry testified that DCS offered to provide transitional and post-custody services to Mother, including housing and employment assistance, if she remained in foster care. However, she said that Mother did not take advantage of these services and instead ran away approximately one month after she was informed of the services.

Ms. Garry testified that Mother and Christopher did maintain regular visitation when Mother was present in foster care. Even when she resided at Madison Oaks in Jackson, Tennessee, Christopher was taken there for visits. However, at the time of trial, Mother had not visited Christopher since January 3, 2009, when he was picked up from Christmas visitation. Ms. Garry testified that during the four month period preceding the filing of the termination petition, Mother did not visit Christopher or attempt to schedule visitation. Ms. Garry testified that, after the termination petition was filed, Mother came to the DCS office in an effort to obtain her birth certificate and social security card. She said that she and Mother scheduled a visit with Christopher at Chuck E. Cheese, but that Mother was a "no-show" at the visit. Ms. Garry testified that Mother contacted her again in August of 2009 to obtain Christopher's foster mother's telephone number, but that Mother did not ask her about visiting Christopher. Ms. Garry testified that Mother and Christopher's foster parent had attempted to schedule one visit since Mother turned eighteen, but due to a conflict with the foster parent's schedule, the visit did not occur.

Ms. Garry testified that Christopher had been living with his current foster mother, Vickie J., for over three years, that he had an extremely strong bond with her, and that he called her "Mommy." She said that Christopher was doing extremely well and receiving excellent care, and that Vickie J. wanted to adopt Christopher.

Vickie J. testified that Christopher was placed in her home when he was one year old. She said that Mother had never sent him birthday gifts and that she had only given him a Christmas present one year. She said that Mother had never provided diapers or any type of financial support for Christopher. Ms. Garry similarly testified that since Christopher had

been in DCS custody, Mother had never provided any type of support for Christopher. Vickie testified that she and Mother discussed setting up a visit just two months prior to the hearing, but due to her work schedule and Mother's transportation problems, they never finalized a date for a visit. Vickie said that Mother had not asked about scheduling any other visits in the past year. Vickie testified that she had never objected to Mother visiting or told Mother that she could not visit. She testified that Mother had always had her telephone number and that her number had not changed.

The deposition of Dr. Chris Bertram was taken for proof just days prior to trial and filed with the court. Dr. Bertram was a clinical psychologist on the evaluation and treatment team at the LeBonheur Center for Children and Parents ("CCP"), which had evaluated Mother in 2008 and provided recommendations to DCS at that time. She was offered, without objection, as an expert psychologist in child abuse cases. Dr. Bertram testified that a psychosocial assessment of Mother was conducted on November 17, 2008, which led the examiner to conclude that Mother "was very poorly equipped to survive[,] herself, independently, outside the world of foster care or of an institution, let alone to provide a home for a child." Dr. Bertram had conducted a psychological evaluation of Mother on December 9, 2008. Mother reported to Dr. Bertram that she had "great difficulty controlling her moods, and that her moods change suddenly, and that she feels she has little to no control over that." Dr. Bertram testified that Mother was easily irritated and frequently wanted to stop the testing Dr. Bertram administered. She explained, "If something's too frustrating, [Mother] wants to get away from it." Dr. Bertram found it "striking" that Mother did not have any insight and did not make any connection between her mood problems and her ability to parent a young child.

Dr. Bertram testified that at Madison Oaks, Mother was extensively tested and found to be moderately mentally retarded. However, Dr. Bertram had performed a screening to "get a feel for" Mother's IQ and estimated it to be in the high 50's, which is "in the very low borderline range to high mild [mental retardation] range." Dr. Bertram thought that Mother could have scored slightly higher if she had persevered in the testing. Nevertheless, she said that Mother was "significantly below average" and "not in the average range of intelligence by any means." Dr. Bertram explained that people with mild mental retardation can, under optimal circumstances, achieve to about a sixth-grade level, but she said that Mother's achievement testing in the various academic subjects ranged from age five to age eight. A reading comprehension test revealed that Mother read at the level of a student who was eight months into the first-grade school year. Dr. Bertram testified that although one could not hand Mother a permanency plan and expect her to read and understand it, Mother was capable of understanding things that were explained to her in a concrete manner, such as being told to stop running away, go to school regularly, stop engaging in fights, etc.

Dr. Bertram testified that Mother was discharged from Madison Oaks "on three heavy-hitting psychotropic medications," including an antipsychotic, a sedating antidepressant, and another sedating medication to decrease her angry mood. Dr. Bertram also testified that Mother was diagnosed with Bipolar Disorder while at Madison Oaks based on her aggressive behavior and irritability. Dr. Bertram further testified that Mother repeatedly acknowledged that she is easily provoked and angered, but Mother "externalizes this" and believes that she simply has no control over her behavior because she is bipolar. Dr. Bertram described Mother's "go-to behavior" as "jumping to engage someone in a physical altercation." Dr. Bertram said that she was "not sure [Mother] has bipolar disorder," based on her interactions with Mother, but that everyone has the ability, with training and medication, to have some control over their behavior. Dr. Bertram testified that Mother freely reported hitting someone living in her foster home in the face less than a month before, but that Mother acted as if such behavior was "no big deal" and had no ramifications for her potential to be a full-time caregiver for a child. Dr. Bertram said that it never seemed to enter Mother's mind that her chronic problematic behaviors – being so easily provoked, ready to fight, and hostile toward people – would bear on her ability to effectively parent a young child.

Dr. Bertram testified that Mother met the criteria for Conduct Disorder due to "her behaving long-term and in an intimidating, threatening way with others, fighting with others, a history of stealing, a history of chronic runaway, and truancy also." She described conduct disorder as a persistent pattern of behavior where other people's needs and welfare are not taken into account. Dr. Bertram also recommended reevaluation by a psychiatrist to investigate whether Mother's attentional problems were caused by an underlying attentional disorder or posttraumatic stress disorder.

The CCP report that was prepared and provided to DCS in December 2008 had recommended that Mother "participate fully" in an in-home parenting program tailored to her intellectual ability, receive individual instruction to improve her reading comprehension skills, and receive individual therapy to address her anger and behavioral issues. The report also indicated that Mother had reported during the assessment that she was considering staying in foster care so that she could participate in the independent living program, and that such participation was to be encouraged. "In short," the report concluded, "[Mother] needs to learn to modulate her moods and control her impulses if there is any hope of her being able to act as a nurturing and stable parent who will be required to tolerate and respond constructively to the sometimes frustrating behavior of young children." The report stated, "If, and only if, [Mother] demonstrates substantial progress in the above recommendations and if unsupervised visitations with her son go well, consideration should be given to a trial placement of Christopher in [Mother]'s care." However, the report went on to state:

Because so much is at stake for Christopher in terms of his psychological wellbeing and social-emotional development, it is recommended that [Mother] be given a relatively short period of time (six months) in which to demonstrate substantial progress in the services provided to her. If she is not able to demonstrate such progress, strong consideration should be given to termination of her parental rights.

Dr. Bertram testified at trial that the treatment team recommended a six-month timeframe because permanency and stability for Christopher deserved very strong consideration. She said that after six months, Mother should have at least "shown the incentive to fully engage in those services, and to take it seriously, and to put forth the effort that's needed to make the progress that you're able to make."

Dr. Bertram testified that if Mother had completed the therapy, parenting training, and independent living program, and actually learned to control her moods since the CCP evaluation, then it would be possible for her to take care of Christopher "with ongoing support and supervision by other people," but not without supervision and monitoring. Dr. Bertram testified that there were "many, many, many risk factors . . . present in this case" for physical abuse and/or neglect. She said that it was "safe to say" that if Mother had not received the recommended services and learned to control her behavior, there would be a very high probability of Christopher being subjected to physical abuse and/or neglect. She explained that Mother would not be able to tolerate the typical behavior of a child, and that Mother would be so preoccupied with her own "very serious problems" that she would not have any empathy for how her behavior impacted Christopher, and she would not be emotionally available for him. Dr. Bertram testified that if Mother had not participated in the recommended services, not only would she continue to have mood problems and conduct disorder, but the problems would probably have worsened and become more entrenched and complicated. Dr. Bertram testified that if Mother had, in fact, run away again and failed to participate in the services or to visit Christopher,

The prognosis would be almost zero – would be almost zero for making the changes necessary to be an appropriate parent for Christopher. And that's without even figuring into the equation the impact [on] him [at] this point at almost age five, of removal from a stable, loving home where he's attached to people. So, I think considering that, I would say there's no chance I would recommend that Christopher go live with her.

The trial court found by clear and convincing evidence that Mother had abandoned Christopher by failing to visit and support him, that she willfully and substantially failed to comply with the requirements of the permanency plans, and that she is incompetent to

adequately provide for Christopher due to her mental condition and likely to remain so in the future. The court also found by clear and convincing evidence that it is in Christopher's best interest that Mother's parental rights be terminated. Accordingly, the trial court terminated the parental rights of Mother and Christopher's unknown father. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issues, slightly restated, for review:

1. Whether the trial court erred in finding, by clear and convincing evidence, that Mother abandoned Christopher by willfully failing to visit and support him;
2. Whether the trial court erred in finding, by clear and convincing evidence, that Mother did not substantially comply with the permanency plans;
3. Whether the trial court erred in finding, by clear and convincing evidence, that Mother was incompetent to adequately provide for Christopher;
4. Whether the trial court erred in finding, by clear and convincing evidence, that DCS made reasonable efforts to assist Mother and developed permanency plans that were reasonable and related to the conditions that required removal; and
5. Whether the trial court erred in finding, by clear and convincing evidence, that termination was in Christopher's best interest.

For the following reasons, we affirm the decision of the chancery court.

## III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *Id.* A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g).

*Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.* Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Abandonment

The first ground for termination listed in the statute, and the one most frequently relied upon, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. There are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)–(v) for purposes of terminating parental rights. Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

**Tenn. Code Ann. § 36-1-102(1)(A)(i).** Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support the child during the relevant time period. *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003).

In addressing this ground for termination in her brief on appeal, Mother points out that she was regularly visiting with Christopher in November and December of 2008 and had overnight visitation with him in January 2009. However, the relevant time period is the four-month period immediately preceding the filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). During that four-month period, the parent must have engaged in more than "token visitation" to avoid a finding of abandonment.[2] **Tenn. Code Ann. § 36-1-102(1)(E).** Here, the termination petition was filed on June 16, 2009. It was undisputed that Mother did not visit Christopher in the four month period prior to the filing of the petition and that she had not seen him since January 3, 2009.

Next, Mother points out that she contacted DCS to obtain Christopher's foster parent's telephone number. She also claims, without citation to the record, that she contacted Christopher's foster mother in an attempt to schedule visits and that the foster mother had a scheduling conflict. Thus, she claims that she was denied the right to visit and that DCS should have intervened to facilitate a visit. The record does support Mother's assertion that she contacted DCS "on her own" while she was on runaway status, but she did not do so until July of 2009, after she turned eighteen and after the termination petition had been filed. The only testimony about an unsuccessful attempt to arrange a visit came from Ms. Garry and from Vickie J., and they testified that the incident was in December of 2009, shortly before trial. Thus, the undisputed evidence in the record is that Mother did not attempt to contact Christopher or schedule a visit during the relevant four-month period. "Abandonment may not be repented of by resuming visitation . . . subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child." **Tenn. Code**

---

[2] "'[T]oken visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" **Tenn. Code Ann. § 36-1-102(1)(C).**

**Ann. § 36-1-102(1)(F).**  Thus, Mother's post-petition efforts do not prevent a finding of abandonment.

We find clear and convincing evidence to support the trial court's finding that Mother abandoned Christopher by willfully failing to visit him for a period of four consecutive months immediately preceding the filing of the petition to terminate her parental rights. Thus, grounds for termination existed.  As noted above, the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights.  *In re S.R.C.*, 156 S.W.3d at 28; *In re J.J.C.*, 148 S.W.3d at 925.  As such, we do not reach the issues of Mother's alleged noncompliance with the permanency plans and mental incompetence.

### B.  Reasonable Efforts by DCS

Next, we will address Mother's argument regarding the adequacy of DCS's efforts in this case.  Our Supreme Court recently addressed DCS's statutory obligation to use "reasonable efforts" to preserve, repair, and restore parent-child relationships whenever the circumstances require it to intervene in family matters.  *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010).  The Court explained:

> The General Assembly has characterized the reasonable efforts that the Department must make as "the exercise of reasonable care and diligence by the [D]epartment to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Accordingly, the manner in which the Department renders services must be reasonable, not herculean. *In re Giorgianna H.*, 205 S.W.3d [508, 519 (Tenn. Ct. App. 2006)]. In addition, the Department is not required to shoulder the burden alone. The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children. *State, Dep't of Children's Servs. v. Estes (In re Q.E.)*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008); *In re Tiffany B.*, 228 S.W.3d [148, 159 (Tenn. Ct. App. 2007)]. The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007). Among the factors that may be used to evaluate the reasonableness of the Department's reunification efforts are: (1) the reasons for removing the child from the parent's custody, (2) the parent's physical and psychological abilities and deficits, (3) the resources available to the parent, (4) the parent's response to and cooperation with the Department's reunification efforts, (5) the resources reasonably available to the Department,(6) the duration and extent of the parent's efforts to address and

remedy the conditions that required the removal of the child, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re J.C.D.*, 254 S.W.3d at 446; *In re Giorgianna H.*, 205 S.W.3d at 519.

*Id.* (footnotes omitted). The child's health and safety shall be the paramount concern. **Tenn. Code Ann. § 37-1-166(g)(1).**

Mother first contends that DCS did not use reasonable efforts because, although she attended counseling in 2008, she was not sent to counseling after 2008. However, Ms. Garry testified that Mother was offered counseling when she completed an assessment at Southeast Mental Health Center in October of 2008, and that Mother only made one follow-up appointment before running away in January of 2009. A referral was also made for Mother to receive counseling at the Exchange Club after the December 2008 Child and Family Team Meeting, but again, she ran away in January before the services began. In addition, Mother testified at trial that she felt that she did not need counseling. We find that DCS's efforts to provide counseling were reasonable, while Mother's efforts were not.

Mother also contends that the permanency plan's requirement that she secure stable housing prior to emancipation "would have been impossible without adequate assistance from DCS" due to her limited resources. While that may be true, Mother was offered assistance from DCS. Mother was offered employment and housing assistance through transitional and post-custody services, and she simply failed to take advantage of such services. Mother was clearly aware of the availability of these services, as she reported to Dr. Bertram that she was considering remaining in foster care so that she could take advantage of them. Yet Mother ran away shortly after the services were discussed with her.

Finally, Mother argues, without elaboration, that DCS failed to use reasonable efforts to assist her in maintaining a bond with her child. From our review of the record, DCS's efforts in this regard were more than reasonable. Mother and Christopher were initially placed in the same foster home, until Christopher was removed due to concerns for his safety. It is undisputed that Mother and Christopher visited regularly while Mother was present in foster care. Even when she resided at Madison Oaks, Christopher was transported to Jackson for visits. The lapses in visitation occurred because Mother persistently ran away from her foster homes. In sum, we find that DCS made reasonable efforts at reunification in this case, and it was Mother's efforts that were unacceptable.

## C.    Best Interest

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d at 530.  In determining whether termination of parental rights is in the best interest of a child, the court shall consider, but is not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

**Tenn. Code Ann. § 36-1-113(i).**  The relevancy and weight to be given each factor depends on the unique facts of each case.  ***In re Audrey S.***, 182 S.W.3d at 878.

Mother argues on appeal that it is not in Christopher's best interest for her rights to be terminated because there is a bond between her and Christopher and she loves him. She also claims that Dr. Bertram reported that Mother displayed good parenting skills, and she claims that Dr. Bertram "expressed that she did not observe anything that would cause her to think that [Mother] would neglect the child." This is simply a mischaracterization of Dr. Bertram's testimony. Dr. Bertram testified that the treatment team did not observe Mother behaving in an abusive manner during their observation of Mother interacting with Christopher. Nonetheless, she quickly noted that there are "many, many risk factors" present in this case that are strongly associated with later incidences of abuse and neglect by a parent. She also testified that it was "safe to say" that if Mother had not received the recommended services and learned to control her behavior, there would be a very high probability of Christopher being subjected to physical abuse and/or neglect. Regarding the bond between Christopher and Mother, Dr. Bertram testified that although Christopher did not act as if Mother was a stranger,

> It's not equivalent to being a stable, loving caretaker. He interacted with her in a way that would not be atypical of someone interacting with perhaps an older sibling, or a cousin, or a babysitter, or someone that you have, you know, you're sort of familiar with, and you're comfortable with, and you like to play with, but not necessarily that you view as or respond to as a caretaker or someone who takes care of you on a daily basis.

Regarding the other best interest factors, we find that Mother has failed to make "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home." **Tenn. Code Ann. § 36-1-113(i)(1).** We also find that DCS exerted reasonable efforts to assist Mother for such a duration of time that lasting adjustment does not reasonably appear possible. **Tenn. Code Ann. § 36-1-113(i)(2).** In the year prior to trial, Mother had not maintained regular visitation or contact with the child. **Tenn. Code Ann. § 36-1-113(i)(3).** Although Mother testified that she was looking for an apartment, she had no place for Christopher to sleep, and she had never been employed. **Tenn. Code Ann. § 36-1-113(i)(7).** She had never provided any support for Christopher. **Tenn. Code Ann. § 36-1-113(i)(9).** Dr. Bertram testified that one of the conclusions of Mother's psychosocial assessment was that Mother "was very poorly equipped to survive[,] herself, independently, outside the world of foster care or of an institution, let alone to provide a home for a child." Dr. Bertram also testified that Christopher was doing very well emotionally and developmentally in his current foster home. She said that, considering the impact of removing him from a stable, loving home, in conjunction with the fact that the chance of Mother making the changes necessary to effectively parent him are "almost zero," there was "no chance" she would recommend that Christopher be placed with Mother. **Tenn. Code Ann. § 36-1-113(i)(5).**

Considering the entire record in this case, we find clear and convincing evidence that it is in Christopher's best interest for Mother's parental rights to be terminated.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Ebony M., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.